UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Dope Shows, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Tab Virgil, Jr., p/k/a "Hot Boy Turk" and/or "Turk" and YNT Empire, LLC, <br><br> Defendants. | **COMPLAINT FOR:** <br> 1. BREACH OF CONTRACT <br> 2. DEFAMATION <br><br> <u>**JURY TRIAL DEMANDED**</u> <br><br> Case No. 25-8980 |

Plaintiff Dope Shows, Inc. ("Dope Shows" or "Plaintiff"), as and for its Complaint against Defendants Tab Virgil, Jr., professionally known as "Hot Boy Turk" and/or "Turk" ("Turk") and YNT Empire, LLC ("YNT") (collectively, "Defendants"), upon personal knowledge as to its own actions and upon information and belief as to the actions of others, alleges as follows:

**PRELIMINARY STATEMENT**

1. Dope Shows is an independent concert promoter with a proven record of delivering high-demand live events in the rap/hip-hop genre of music. Since 2017, Dope Shows has promoted more than 50 concerts with an approximately 80 percent sellout rate, has sold out every major indoor venue in Philadelphia, including the Wells Fargo Center, and has helped elevate many artists to wider audiences.

2. The two Defendants to this case are a rapper known as Turk, and YNT, which is a company co-owned by Turk and his manager/wife. This lawsuit arises from Defendants' attempt to sabotage the Cash Money Millionaires 30th Anniversary Tour (the "Tour") and their other related misconduct. Consistent with its name, the Tour is a celebration of the legendary record label Cash Money Records. The Tour features musical performances from numerous superstars

associated with Cash Money Records, including but not limited to the artists professionally known as Juvenile and Birdman.  Defendant Turk was invited to join the Tour given his affiliation with a musical group known as the Hot Boys, which released certain music over the years on Cash Money Records.

3.  Desperate to revive his flagging rap career, Turk is attempting to sabotage the Tour through childish and petulant antics that he hopes will regain the public's attention.  Turk's publicity stunts are an abject failure, as they have done nothing to advance his career.  Rather, through his malicious and misguided actions, Turk has created nothing more than massive legal liability for himself in this lawsuit.

4.  First, Turk concocted an online feud with another performer on the tour, who is professionally known as BG.  To draw attention to this purported feud, Turk posted a torrent of physical threats against BG on the Internet, and he persisted in making these threats even after Dope Shows told him to stop.  Turk's threatening conduct towards BG did not merely breach his contract with Dope Shows, but it also placed the entire Tour at risk.  Based on this conduct, Dope Shows had more than an ample basis to terminate, and did terminate, Turk's participation in the tour.

5.  Second, Turk repeatedly defamed Dope Shows by falsely asserting to the public that Dope Shows purportedly did not have enough money to pay him.  Turk knew this accusation was untrue, but nonetheless he brazenly repeated it, time and time again.  Turk's malicious and defamatory accusation has resulted in Dope Shows suffering a direct loss of revenue from the Tour, as well as significant reputational injury in the music business.

6.  Third, in another cry for attention, Turk has repeatedly disclosed to the public highly confidential information regarding the Tour and its finances.  Through these disclosures,

Turk breached the confidentiality obligations in his contract with Dope Shows, thereby entitling Dope Shows to a significant damages award.

7. *Finally*, Turk and YNT commenced a sham lawsuit against Dope Shows in Florida State Court. This lawsuit is wholly illegitimate because, among other reasons, the contract between Defendants and Dope Shows requires any such lawsuit to be brought in New York City. Turk and YNT obviously filed this lawsuit solely as a publicity stunt, as evidenced by the fact that they posted their Florida complaint on Instagram. These actions by Defendants constitute another breach of the parties' contract, and they give rise to additional and significant defamation liability for Defendants.

8. Dope Shows filed this lawsuit because it will not tolerate Turk's sabotage efforts. Nor will Dope Shows sit idly by while Turk continues to defame it with knowing falsehoods. Through this lawsuit, Dope Shows seeks an end to Turk's misconduct, and to obtain substantial compensation for the injuries that Turk has needlessly caused.

## THE PARTIES

9. Dope Shows is a Delaware corporation that maintains its principal place of business in the State of Pennsylvania.

10. Turk is a citizen of the State of Georgia. Turk is a recording artist, songwriter, and performer in the rap/hip hop genre of music.

11. YNT is a Georgia limited liability company that maintains its principal place of business in the State of Georgia. YNT furnishes Turk's services in the music industry to third parties. YNT's members (*i.e.*, owners) are Turk and Ms. Emani Virgil, both of whom are citizens of the State of Georgia. Ms. Virgil is Turk's wife and Defendants' personal manager. In her role as Defendants' personal manager, she acts as Defendants' legal agent and official

3

representative for matters pertaining to the music business and Turk's career in music.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. This Court has personal jurisdiction over Defendants because Section 17.2(a) of the Performance Contract (hereinafter defined) states in relevant part: "This contract shall be governed by and construed under the laws and judicial decisions of the State of New York.  All claims and disputes arising out of the interpretation, performance or breach of this Agreement shall be submitted exclusively to the jurisdiction of the courts of the State of New York (state and federal) located in New York County . . . ."

14. Venue is proper in this district pursuant to the provisions of Section 17.2(a) of the Performance Contract that are quoted in the preceding paragraph of this Complaint.

## STATEMENT OF THE CASE

### THE RELEVANT TERMS OF THE PERFORMANCE CONTRACT

15. On or about March 14, 2025, Defendants signed a Performance Contract with Dope Shows.  The Performance Contract required, among other things, for Turk to perform at ten concerts as part of the Cash Money Millionaires 30th Anniversary Tour (the "Tour") in exchange for specified monetary remuneration.

16. The Performance Contract imposes stringent confidentiality restrictions on Defendants.  For example, Section 15.1 provides:

> Purchaser understands and agrees that no information regarding each individual Artist's guarantee, rider requirements, show grosses or attendance will be reported by Purchaser to any third party without the express prior written permission of Company or Company's representative. Failure to comply will be treated as a

4

> material breach of this Agreement, and Company reserves all rights and remedies available to Company at law, in equity or otherwise.

Section 15.2 imposes additional confidentiality restrictions on Defendants and it states:

> The parties acknowledge that the terms of this Agreement and any oral or written information exchanged between the Parties in connection with the preparation and performance of this Agreement are regarded as confidential information.  Each party shall maintain confidentiality of all such confidential information, and it shall not disclose any relevant confidential information to any third parties, except for the information that: (a) is or will be in the public domain (other than through the receiving Party's unauthorized disclosure); (b) is under the obligation to be disclosed pursuant to the applicable laws or regulations, or orders of the court or other government authorities; or (c) is required to be disclosed by any party to its legal counsel or financial advisors regarding the transaction contemplated hereunder, provided that such third parties will be bound by confidentiality obligations similar to those set forth in this Section 26. Disclosure of any confidential information by a party without the other party's express consent will be deemed a breach of this Agreement.

17. Section 17.2(a) of the Performance Contract contains a mandatory New York forum selection clause.  It states in relevant part:

> This contract shall be governed by and construed under the laws and judicial decisions of the State of New York.  All claims and disputes arising out of the interpretation, performance or breach of this Agreement shall be submitted exclusively to the jurisdiction of the courts of the State of New York (state and federal) located in New York County . . . .

18. Section 14.3 of the Performance Contract provides that, if Defendants breach the Performance Contract, they must return to Dope Shows any payments they received for the Tour.  It states: "In the event of a breach of this agreement by [YNT] or [Turk], [YNT] or [Turk] (As applicable) shall work in good faith to find resolution, but subject to return 100% of all amounts received hereunder (including 100% of the Flat Fee), less [Turk's] bona fide reasonable mutually approved out-of-pocket expenses incurred in connection herewith promptly following [Dope Show's] notice to [YNT] or [Turk] demanding the same (such notice by email to suffice)."  Although Defendants have

committed numerous breaches of the Performance Contract (as discussed in detail below), Defendants have failed to return to Dope Shows the monies they were paid under the Performance Contract.

## DEFENDANTS MATERIALLY BREACHED THE PERFORMANCE CONTRACT

19. In advance of the scheduled start of the Tour on July 26, 2025, Turk began making public threats on the Internet against another member of the Hot Boys who was participating in the Tour: Christopher Noel Dorsey, professionally known as BG. By way of example, in a YouTube video dated July 11, 2025, Turk strongly implied that BG would be the victim of gun violence the next time that BG saw Turk. Turk went so far as to make gunfire noises when he was discussing the fate of BG. *See* https://www.youtube.com/watch?v=Ej7FMCxu25s at 6:35 to 6:45.

20. Dope Shows informed Turk that he should stop making threats against BG.

21. However, Turk refused to stop making public threats against BG.

22. A representative of Turk attempted to justify Turk's conduct by stating that the controversy over Turk's threats was good for business. However, regardless of the effect of these threats on Turk's own business, they were highly detrimental to Dope Shows' business in general, and to the Tour in particular.

23. Indeed, Turk's continuing threats against BG almost ruined the Tour. First, on the basis of these threats, numerous concert venues stated that they intended to cancel scheduled dates for the Tour out of fear that violence would erupt. Indeed, at least one of the venues in which the Tour was scheduled informed Dope Shows that it did not want Turk to perform there, because of his threats. Second, Turk's threats put at risk BG's continued participation in the Tour. BG presently is on supervised release after serving

6

time for a federal conviction, and his activities in the music business therefore must be approved in advance by his probation officer. If Turk persisted with his threats, a significant risk existed that BG's probation officer could prohibit BG's further participation in the Tour. It would have been highly detrimental for BG to have left the Tour, given that BG is a star in the rap/hip-hop world who attracts a substantial audience to his concert performances. In contrast, Turk is not a star, and he does not attract any material number of audience members to performances on the Tour.

24. Given Turk's refusal to stop making threats against BG, Dope Shows had no choice but to drop Turk from the Tour.

25. Following Turk's termination from the Tour, Defendants began posting confidential information about the Tour's finances on Instagram in violation of their confidentiality obligations in Sections 15.1 and 15.2 of the Performance Contract. The confidential information that Defendants posted to Instagram included, but was not limited to, the amount of monies that Dope Shows agreed to pay Defendants, as well as Dope Shows' alleged revenues for specific tour dates.

26. Turk further disparaged the Tour on social media, by falsely claiming that he was dropped from the Tour because Dope Shows did not have the money to pay him, when, in truth, he was dropped due to his irresponsible conduct that threatened the survival of the entire Tour. Turk's false and defamatory assertions regarding Dope Shows' purported lack of money deterred consumers from attending Tour performances. These false assertions have also damaged Dope Shows' reputation in the music industry, including with other performing artists who now question Dope Shows' ability to pay them for concert dates based upon Turk's malicious falsehoods.

**TURK AND YNT UNLAWFULLY FILE A SHAM LAWSUIT IN FLORIDA**

27. On or about September 25, 2025, Turk and YNT filed a lawsuit in the Circuit Court of the 17th Judicial Circuit, in and for Broward County, Florida (the "Sham Florida Lawsuit") against Dope Shows, and against an unrelated company called Artists By Artists.  (Artists By Artists is the booking agent for the Tour.)

28. The Sham Florida Lawsuit is an unlawful publicity stunt.  Turk and YNT commenced the Sham Florida Lawsuit for the malicious purpose of defaming Dope Shows and pressuring it to allow Turk and YNT to retain the $100,000 payment that they wrongfully received from Dope Shows.

29. The bogus nature of the Sham Florida Lawsuit is demonstrated by the very fact that it was filed in violation of the mandatory New York forum selection clause in Section 17.2(a) of the Performance Contract.  Turk and YNT are fully aware of the requirements of Section 17.2(a), given that they attached a copy of the Performance Contract to their Complaint in the Sham Florida Lawsuit (hereafter, the "Sham Complaint").  Turk and YNT intentionally filed this Sham Complaint in a court that cannot adjudicate their bogus claims because they do not actually wish for those claims to be adjudicated.  Rather, Turk and YNT merely seek for the media to report their false and defamatory accusations in the Sham Complaint, so that Dope Shows' reputation in the music industry is further tarnished.

30. Indeed, the Sham Complaint contains knowingly false and defamatory assertions of fact against Dope Shows.  Most significantly, Paragraph 26 of the Sham Complaint falsely accuses Dope Shows of "not having enough money to cover Turk and YNT's artist fee" under the Performance Contract.  Defendants know full well that this

accusation is completely untrue. This is because Turk and/or his manager and wife, Ms. Virgil, on behalf of Turk, routinely participated in telephonic conference calls with Dope Shows and the representatives for other performing artists on the Tour. Based upon the information disclosed on the conference calls, Defendants knew that Dope Shows had more than sufficient funds to fulfill its payment obligations.

31. The Sham Complaint further falsely alleges, in Paragraph 23, that prior to Turk being dropped from the tour, Dope Shows sought to reduce the dollar amount that would be paid to Turk and YNT in advance of their Tour Performances. However, as Turk and YNT are fully aware, this also is completely untrue. Dope Shows did not seek to reduce the dollar amount that they would be paid. Rather, Dope Shows merely sought to change how the payments they received would be characterized as an accounting matter, given that seven of the ten shows on the Tour were being rescheduled for later dates than those which were originally anticipated.

32. In addition to defaming Dope Shows, the publicly filed Sham Complaint (as well as the exhibits thereto) is rife with highly confidential information about the Tour and its finances. The confidential information includes, but is not limited to, the monies that Dope Shows paid to Turk, as well as Dope Shows' alleged revenues for specific tour dates. Pursuant to Sections 15.1 and 15.2 of the Performance Contract, Turk and YNT should not have included any of this confidential information in the publicly filed version of the Sham Complaint. Rather, Turk and YNT should have filed that information under seal.

33. Thereafter, Turk and YNT publicly posted on Instagram the entirety of the Sham Complaint. Through this posting on Instagram, Turk and YNT: (a) republished the

Sham Complaint's false assertions against Dope Shows, thereby committing the tort of defamation; and (b) circulated to the world the highly confidential information in the Sham Complaint, thereby once again breaching Sections 15.1 and 15.2 of the Performance Contract.

### TURK AND YNT MAKE ADDITIONAL DEFAMATORY STATEMENTS

34. Defendants also defamed Dope Shows on other occasions, by making additional false assertions on Instagram that Dope Shows purportedly lacked the funds to pay Defendants and the other performers on the Tour. These defamatory statements are as follows:

| Date and Time | Speaker | Platform/Outlet | Statement |
|---|---|---|---|
| 2025.09.27 at 10:25 video mark. | Turk | Instagram | "What it seemed to me you [Dope Shows] did not have sufficient funds like you signed up to say you did." |
| 2025.09.27 at 22:05 video mark. | Turk | Instagram | "I need guaranteed money… That's the purpose of you [Dope Shows] having a contrcat when you saying you have sufficient funds to cover that $400,000. That's saying we secure. At least that's what I thought." |
| 2025.09.27 at 24:23 video mark. | Turk | Instagram | "I can understand you [Dope Shows] not having the whole thing." |
| 2025.10.03 at 0:25 video mark. | Turk | Instagram | "All the managers had a conference call right about the Dope Shows Promoters saying now they don't have enough money to pay everybody. Hold on. But we signed a contract for you all to pay, it ain't on us if you all lose it now." |
| 2025.10.03 at 1:38 video mark. | Turk's wife and Defendants' Legal Agent, Ms. Emani Virgil. | Instagram | "While in Nashville, not only umm was Turk and from my knowledge no other artist was paid umm so the Nashville show did not play. The agend, Andrew Ellington, did not pay any of the artitsts for this particular show. What they didn't receive their backends. So Nashville show did not play." |

### FIRST CAUSE OF ACTION

**(Breach of the Performance Contract)**

35. Paragraphs 1 through 34 of the Complaint are hereby incorporated

10

by reference.

36. The Performance Contract is a valid and enforceable contract under New York Law between Dope Shows, on one hand, and Defendants, on the other hand.

37. Dope Shows has performed, tendered performance of, and/or is excused from performing its contractual obligations under the Performance Contract.

*Defendants' Breach of Express Provisions of the Performance Contract*

38. Defendants materially breached Sections 15.1 and 15.2 of the Performance Contract by disclosing confidential information to the public.

39. Defendants further materially breached the Performance Contract by failing to return to Dope Shows the monies they were paid under the Performance Contract, as required by Section 14.3 of the Performance Contract.

*Defendants' Breach of the Implied Duty of Good Faith in the Performance Contract*

40. Under New York law, there exists an implied duty or covenant of good faith and fair dealing pursuant to which neither party to a contract shall do anything, which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract (the "implied duty of good faith and fair dealing").

41. As a result of Turk's continued threats to BG, Defendants breached the implied duty of good faith and fair dealing and accordingly committed another material breach of the Performance Contract.

42. All of Defendants' contractual breaches set forth above are non-curable and/or Defendants failed to cure them within the allotted time under the Performance Contract.

43. Dope Shows has been injured by Defendants' material breaches of the

Performance Contract.

44. As a result of the foregoing, Plaintiff seeks an award of actual damages, as well as consequential damages in the form of lost profits, with all such amounts to be determined at trial, but in no event less than $5 million.

45. Plaintiff is also entitled to an award of its court costs and reasonable attorneys' fees and witness fees.  Section 17.2(b) of the Performance Contract states:

> The prevailing party in any legal action (after all appeals have been taken or the time for taking such appeals has expired) brought by one party against the other and arising out of this [Performance Contract] shall be entitled, in addition to any other rights and remedies available to it at law or in equity, to reimbursement for its costs and expenses (including court costs and reasonable fees for outside attorneys and expert witnesses) incurred with respect to the bringing and maintaining of any such action.  The term "prevailing party" for the purposes of this paragraph shall include a defendant who has by motion, judgment, verdict or dismissal by the court, successfully defended against any claim that has been asserted against it.

Plaintiff's claim for breach of the Performance Contract plainly is a "legal action . . . brought by one party against the other and arising out of the" Performance Contract. Pursuant to 17.2(b), Plaintiff seeks an award of its reasonable attorneys' fees, expert fees, and costs from this action as well as any appeal(s) thereof.

46. All conditions precedent to Plaintiff's claims for relief in this action have been performed, or have occurred, or have been waived.

## SECOND CAUSE OF ACTION

**(Defamation)**

47. Paragraphs 1 through 34 of the Complaint are hereby incorporated by reference.

48. Defendants repeatedly published false assertions of fact that Dope Shows purportedly lacked the money to pay the performers on the Tour.

12

49. Defendants' assertions are false.

50. Defendants' assertions are defamatory on their face, by subjecting Plaintiff to, among other things, public hatred, shame, contempt, ridicule, and disgrace.

51. Defendants' assertions are not protected by any privilege.

52. Although Plaintiff need not establish Defendants' actual malice to prevail in this action, Defendants indeed made their false assertions with actual malice. In other words, Defendants knew that their assertions regarding Dope Show's purported lack of money were false; or, at minimum, Defendants knew that they were without any basis in fact, and Defendants made them in reckless disregard of whether they were false or not.

53. In publishing their defamatory assertions, Defendants also acted with common-law malice and an intent to injure Plaintiff's reputation.

54. Defendants' assertions are defamatory *per se*, by directly injuring Plaintiff in its professional dealings, and by natural consequence causing Plaintiff actual damage.

55. As a result of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but in excess of $7 million, and Plaintiff is further entitled to punitive damages in an amount also to be determined at trial.

56. Plaintiff is also entitled to an award of its court costs and reasonable attorneys' fees and witness fees. Section 17.2(b) of the Performance Contract states:

> The prevailing party in any legal action (after all appeals have been taken or the time for taking such appeals has expired) brought by one party against the other and arising out of this [Performance Contract] shall be entitled, in addition to any other rights and remedies available to it at law or in equity, to reimbursement for its costs and expenses (including court costs and reasonable fees for outside attorneys and expert witnesses) incurred with respect to the bringing and maintaining of any such action. The term "prevailing party" for the purposes of this paragraph shall include a defendant who has by motion, judgment, verdict or dismissal by the court, successfully defended against any claim that has been asserted against it.

Plaintiff's claim for defamation plainly is a "legal action . . . brought by one party against the other and arising out of the" Performance Contract, given that Dope Shows was defamed by Turk's false assertions that Dope Shows purportedly could not pay monies owed under the Performance Contract. Pursuant to 17.2(b), Plaintiff seeks an award of its reasonable attorneys' fees, expert fees, and costs from this action as well as any appeal(s) thereof.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

On the First Cause of Action:

> Direct and consequential damages in an amount to be determined at trial, but no less than seven million dollars ($7,000,000);
>
> An award of its reasonable attorneys' fees, expert fees, and costs from this action as well as any appeal(s) thereof;

On the Second Cause of Action:

> Damages in an amount to be determined at trial, but no less than seven million dollars ($7,000,000);
>
> Punitive damages in an amount to be determined at trial;
>
> An award of its reasonable attorneys' fees, expert fees, and costs from this action as well as any appeal(s) thereof; and

Such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Dope Shows demands a trial by jury of all claims that are so triable.

Dated: October 29, 2025
      New York, New York

                                    By:    *Jeffrey M. Movit*
                                                  Jeffrey M. Movit

                                                  CHAUDHRYLAW PLLC
                                                  147 West 25th Street, 12th Floor
                                                  New York, New York 10001
                                                  Tel: (212) 785-5550
                                                  jeff@chaudhrylaw.com

                                                  *Attorney for Plaintiff*
                                                  *Dope Shows, Inc.*